UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**DEVIN BARRIOS ET AL.**　　　　　　　　**CIVIL ACTION**

**VERSUS**　　　　　　　　　　　　　　　**NO: 17-585**

**CENTAUR LLC ET AL.**　　　　　　　　　**SECTION: "H"**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Devin Barrios and his wife, Megan Barrios, bring claims for damages he sustained in an accident that occurred while he was working a construction job for Centaur, LLC. Plaintiffs bring claims under the Jones Act and general maritime law against Devin Barrios's employer, Centaur, LLC. Plaintiffs also bring claims for negligence under the Longshore and Harbor Worker's Compensation Act against Centaur and River Ventures, LLC. This matter went to trial November 13 through 19, 2018. Having considered the evidence admitted at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

# FINDINGS OF FACT

1. At all material times, Plaintiff Devin Barrios was employed by Centaur, LLC ("Centaur") and was acting in the course and scope of his employment when he was injured on January 25, 2016.
2. Centaur, a marine construction company, was hired by United Bulk Terminals Davant, LLC ("UBT") to build a concrete containment wall around the edge of its dock facility.
3. Barrios worked as a member of Centaur's construction crew performing manual labor.
4. Centaur leased a barge to assist in the containment wall project. The barge moved by winch along the dock to assist in the project.
5. The barge was a vessel in navigation. The mission of the barge was to assist Centaur in building the containment wall.
6. The Court found the testimony of Brandon Lavergne to be unreliable.
7. The Centaur crew stored tools for the containment wall project on the barge. They held safety meetings, took breaks, and ate lunch aboard the barge. They also unpacked and packed up tools aboard the barge.
8. The Centaur crew occasionally performed tasks like drilling holes, cutting rebar, and pouring forms aboard the barge, but the majority of the dock construction work was performed on the dock.
9. Barrios spent less than 30% of his time on the barge in service of its mission.
10. Barrios is not a seaman.
11. UBT hired River Ventures, LLC ("River Ventures") to provide a crew boat, the M/V TROOPER, to ferry Centaur workers and occasionally their equipment from the parking lot to the area of the dock upon which they were working.

12. River Ventures is the owner/operator of the M/V TROOPER.
13. John Hanna is the owner/operator of River Ventures.
14. John Ochello was the Captain of the M/V TROOPER and an employee of River Ventures. Captain Ochello remained in operational control of the M/V TROOPER at all times.
15. Barrios was a passenger on the M/V TROOPER, not a member of its crew.
16. On the morning of January 25, 2016, Plaintiff and other members of the Centaur crew rode from the parking lot to the barge on the M/V TROOPER. They loaded a wheeled, portable generator from a crew member's truck in the parking lot on to the M/V TROOPER for transport to the barge.
17. Plaintiff was injured while transferring the portable generator from the M/V TROOPER to the barge.
18. The generator weighed more than 150 pounds.
19. At the time of the injury, the Centaur crew transferred the generator in a manner that had been done several times before.
20. While transferring the generator with the assistance of another crewmember, Plaintiff placed one foot on the crew boat and one foot on the rub rail of the barge. After the generator was lifted from the crew boat and placed onto the barge, the crew boat and barge began to separate from each other, and Plaintiff fell into the water below. As he was falling, he grabbed onto the generator, which caused the generator to fall into the water and strike Plaintiff on the head.
21. Plaintiff fell into freezing cold water and had to swim out from underneath the barge before being rescued by the M/V TROOPER further down the river.

22. The rope tied to the life ring aboard the M/V TROOPER was tangled around the life ring. A member of the Centaur crew threw the ring and its rope to Plaintiff in the water but could not hold onto the end of the rope because it was tangled.
23. Plaintiff's fall into the water was a harrowing experience. He testified that he "swam toward the light" but did not know to which light he was swimming or, apparently, whether he was dead or alive.
24. Captain Ochello did not moor the crew boat to the barge before allowing the Centaur crew to perform the transfer of the generator.
25. Instead of mooring the crew boat, Captain Ochello used the "twin screwing" method wherein he attempted to hold the vessel against the barge using the thrust of the engines.
26. This Court found the testimony of Robert Borison, an expert in Marine Safety, and Patrick Cuty, an expert in Vessel Operations, Root Cause Analysis, & Transfer of People and Equipment to and from Vessels, credible that tying off the crew boat to the barge would have prevented the separation from occurring.
27. Captain Ochello was negligent for failing to tie the M/V TROOPER to the barge during the transfer and/or for failing to provide mooring lines on the M/V TROOPER.
28. There were sufficient bits available on the barge to tie up the M/V TROOPER.
29. Jerry Hanna testified that River Ventures had no policy regarding tying off its vessels during the transfer of equipment. He testified that he was aware that Captain Ochello allowed pieces of equipment to be offloaded from the M/V TROOPER without first tying off the vessel.

30. The Court found credible the testimony of Borison and Cuty that Plaintiff could not have pushed the crew boat away from the barge as a result of his side straddle. Plaintiff could not have provided enough force to move the vessel if Captain Ochello was holding the vessel steady with his engines.
31. Captain Ochello was negligent in failing to hold the crew boat steady against the barge as the generator was being transferred.
32. Captain Ochello's negligence was the sole cause of the accident in question.
33. The Centaur crew's use of only two people to move the portable generator from the M/V Trooper to the barge by hand was awkward and ill advised, however, this was not the cause of the accident or injury.
34. The failure to perform a job safety analysis prior to moving the generator was not a cause of the accident or Plaintiff's injury and/or would not have prevented the accident or Plaintiff's injury.
35. Any alleged negligence by Centaur in failing to properly train its employees in proper lifting techniques was not a cause of the accident at issue here.
36. The alleged failure of Plaintiff to wear a chin strap on his hard hat was not a cause of his injury and/or would not have prevented his injury.
37. Plaintiff's decision to side straddle the barge and the crew boat was not a cause of his injury. Plaintiff had no reason to believe that Captain Ochello would not hold the vessel steady as he had done for prior transfers.
38. Plaintiff was 22 years old at the time of the accident.

39. Plaintiff received 28 staples in his head as a result of the accident. He reported suffering neck pain within a few days.
40. Dr. Peter Liechty, MD, Plaintiff's treating neurosurgeon, testified that an MRI of Plaintiff's back showed abnormal discs. Dr. Liechty performed a C4/5, C5/6 anterior cervical discectomy and fusion surgery in May 2017.
41. Dr. Liechty testified that because of Barrios's age, he will likely require an additional surgery to his cervical spine at some point. Defendants did not submit any evidence to dispute this opinion.
42. The Court found Dr. Gerard Gianoli, MD, Plaintiff's treating neurotologist, to be very credible. Dr. Gianoli testified that Plaintiff suffered a bilateral perilymphatic fistula, labyrinth concussion, bilateral benign positional vertigo, and some hearing loss from the accident. Plaintiff suffers from spinning vertigo and dizziness brought on by pressure-inducing activities. Plaintiff will have to limit activities that cause head pressure for the remainder of his life, including nose blowing, lifting, air travel, and driving. Plaintiff's symptoms have become manageable with medication, diet, and activity restriction. However, absent surgery, Plaintiff's condition will never completely resolve.
43. The Court found the opinion of Dr. Gerald Calegan, an expert in neurology, to be most credible on the issue of Plaintiff's head injury. Dr. Calegan opined that Barrios sustained a mild traumatic brain injury, which contributes to his frequent headaches, impaired balance, intermittent vertigo, insomnia, and worsened mood. Dr. Calegan also opined that most of Plaintiff's disability is a result of

his neck pain and headaches, which contribute to his attention and concentration difficulties.

44. Prior to this accident, Plaintiff suffered from depression and anxiety. This accident has significantly exacerbated those conditions.

45. Plaintiff's condition presents a complicated medical picture. Plaintiff continues to suffer from headaches, neck pain, dizziness, inability to focus, and confusion to the date of the trial. His condition is not expected to significantly improve in the future.

46. The Court finds that Plaintiff's continued daily use of narcotics may contribute to some of his ongoing complaints of confusion and inability to focus. A reduction in the use of narcotics may improve some of the symptoms Plaintiff continues to experience.

47. All of the aforementioned injuries were caused by the accident at issue here to a reasonable degree of medical certainty.

48. The Court found the testimony of Dr. Todd Cowen, an expert in physical medicine and rehabilitation, pain management, life care planning & physician life care planning, to be credible. Dr. Cowen is both a life care planner and a medical doctor and is qualified to opine on Plaintiff's future healthcare needs. Dr. Cowen's opinions were consistent with the testimony of Plaintiff's treating physicians.

49. Dr. Cowen estimates that in the future Plaintiff will require physical therapy, pain management, treatment for his inner ear issues, and an additional cervical spine surgery, totaling approximately $587,509.87.

50. Plaintiff has incurred $289,301.68 in past medical expenses.

51. Plaintiff has not worked since the accident.

52. Plaintiff's work life expectancy from the date of trial is 34.21 years.

53. In 2015, Plaintiff earned $25,724.76 annually.
54. Plaintiff's past loss wages from the time of the accident to the trial date are $65,647.00.
55. Given Plaintiff's age and abilities, this Court finds that it is more likely than not that he would have received incremental promotions throughout the remainder of his working life.
56. If Plaintiff were unable to return to work for the remainder of his working life, this Court agrees with Randolph Rice's calculation that the present value of his future wage loss would be $1,665,636.00.
57. However, this Court finds that Plaintiff can return to work at light and sedentary duty. Any future employment should avoid the operation of heavy machinery and heights. This Court also finds that Plaintiff cannot secure employment as a draftsman as suggested because of his difficulty in mathematics.
58. Plaintiff can obtain employment in the $7.25–$10.00 per hour range, earning approximately $525,000 during his working life.
59. Plaintiff's lost future earnings amount to $1,140,636.00.
60. Plaintiff Devin Barrios is married to Plaintiff Megan Barrios and they share a 3-year-old son.
61. The Court found the testimony of Meghan Barrios compelling. Plaintiffs' marriage has been adversely impacted by Plaintiff Devin Barrios's injuries. Megan Barrios reports that Devin Barrios is less loving, less social, more depressed, and more withdrawn than prior to the accident. He is unable to help around the house to the same level as before the accident. She cannot trust him to watch their son alone because of his inability to focus and tendency to get confused. In addition, she testified that since the accident she feels like more

of a friend than a wife, and their intimate relationship has dramatically changed.

62. Plaintiff's medical condition prevents him from lifting his son or contributing to his care to his desired level.

## **CONCLUSIONS OF LAW**

Jones Act and Maintenance and Cure Claims against Centaur

1. "The Jones Act provides a cause of action in negligence for 'any seaman' injured 'in the course of his employment.'" *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (quoting 46 U.S.C. § 688(a)).

2. In addition, a seaman who becomes sick or injured during his service to the ship is entitled to maintenance and cure. *Cooper v. Diamond M Co.*, 799 F.2d 176, 178–79 (5th Cir.1986) (citations omitted).

3. To maintain a cause of action under either the Jones Act or for maintenance and cure benefits, the plaintiff must be a seaman. *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 346 (5th Cir. 1999); *Hall v. Diamond M Co.*, 732 F.2d 1246, 1248 (5th Cir. 1984).

4. "The standard for determining seaman status for purposes of maintenance and cure is the same as that established for determining status under the Jones Act." *Hall*, 732 F.2d at 1248.

5. The Jones Act, however, does not provide a definition of a 'seaman.'" *Chandris, Inc.*, 515 U.S. at 355. The Supreme Court has promulgated two requirements for an employee to achieve seaman status. *Id.* at 368. First, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Id.* Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both

its duration and its nature." *Id*. As a general rule of thumb, "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id*.

6. "[P]laintiff cannot claim time spent sleeping or eating in this [seaman status] analysis, because this time was not spent in the service of a vessel in navigation." *Butcher v. Superior Offshore Int'l, LLC*, No. 07-8136, 2008 WL 5110629 (E.D. La. Dec. 2, 2008); see *Moore v. AEP Memco LLC*, No. 07-1353, 2008 WL 3851574, at *5 (E.D. La. Aug. 13, 2008) ("[E]ating lunch or seeking refuge from rough weather is not the type of connection to a vessel or fleet of vessels that creates seaman status."); *Butcher v. Superior Offshore Int'l, Inc.*, 357 F. App'x 619, 620 (5th Cir. 2009) ("Butcher agreed with counsel's question that he worked thirty percent of his time on board the vessel but this included time spent for meals and breaks, which does not make Butcher a seaman. Furthermore, Butcher's testimony describing his daily activity showed that he spent less than thirty percent of his time actually working on board the MAGGIE.").

7. Given the findings of fact herein, this Court has found that Plaintiff was not a seaman. Plaintiff spent insufficient time in service of the vessel to attain seaman status.

8. Plaintiff cannot succeed on his claims under the Jones Act or for maintenance and cure against his employer, Centaur.

## 33 U.S.C. § 905(b) Vessel Negligence against River Ventures

9. Under 33 U.S.C. § 905(b) of the Longshore and Harbor Worker's Compensation Act ("LHWCA"), an injured worker may bring a claim against a vessel owner for vessel negligence.

10. Section 905(b) "preserves an injured worker's pre-existing right, under general maritime law, to recover for third-party negligence." *May v. Transworld Drilling Co.*, 786 F.2d 1261, 1264 (5th Cir. 1986).

11. "To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

12. "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). "[V]essel owners owe their passengers a duty of reasonable care under the circumstances." *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 357 (5th Cir. 2016). The Fifth Circuit has held that "'shipowners, relatively speaking, are held to a high degree of care for the safety of their passengers.'" *Id.* (quoting *Smith v. Southern Gulf Marine Co. No. 2*, 791 F.2d 416, 420 (5th Cir. 1986)). A duty of reasonable care under the circumstances includes "a duty to provide a safe egress from its vessel and a duty to warn . . . of any dangers of which [the shipowner] knew or should have known." *Gonzales v. River Ventures, LLC*, No. 15-2145, 2017 WL 1364842, at *10 (E.D. La. Apr. 14, 2017) (Brown, J.).

13. River Ventures and Captain Ochello owed Plaintiff, a passenger on the M/V TROOPER, a duty of reasonable care, including a duty to provide a safe egress from the vessel.
14. Captain Ochello breached his duty to Plaintiff in failing to provide for a safe transfer. Specificallly, Ochello failed to (1) moor the M/V TROOPER to the barge during the transfer and (2) hold the M/V TROOPER steady to the barge during the transfer.
15. Captain Ochello's negligence caused the M/V TROOPER to separate from the barge during the transfer.
16. Captain Ochello's negligence was the sole proximate cause of the injuries sustained by Plaintiff.
17. River Ventures is liable to Plaintiffs for the negligence of its Captain under 33 U.S.C. § 905(b) for the damages that Plaintiffs sustained as a result of the incident at issue here.

33 U.S.C. § 905(b) Vessel Negligence against Centaur

18. Plaintiff next alleges that Centaur was negligent in its capacity as operator of the barge for failing to provide a crane operator to utilize the crane to move the portable generator.
19. "When an employer acts in a dual capacity as vessel owner, the entity retains its immunity for acts taken in its capacity as an employer, but may still be sued 'qua vessel' for acts of vessel negligence." *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 531 (5th Cir. 1991).
20. Plaintiffs have not carried their burden to show that Centaur was negligent for failing to provide a crane operator to move the portable generator.

21. Failure to use a crane to move the portable generator was not a cause in fact of the accident in question.

Limitation of Liability

22. The Limitation of Liability Act provides in relevant part that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505. "The determination of whether a shipowner is entitled to limitation employs a two-step process. First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). Once, as here, negligence of the vessel has been established, the owner can limit its liability only by proving "it lacked privity or knowledge of the condition." *Petition of Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996).

23. "There is a duty to inquire about conditions and practices likely to produce or contribute to loss, unless appropriate means are adopted and adhered to in order to prevent loss." *Gabarick v. Laurin Mar. (Am.), Inc.*, 900 F. Supp. 2d 669, 677 (E.D. La. 2012), *aff'd*, 551 F. App'x 228 (5th Cir. 2014).

24. Given the fact that the owner of River Ventures, Jerry Hanna, was aware of Captain Ochello's unsafe custom of allowing equipment to be offloaded from the M/V TROOPER without first tying up the vessel and Mr. Hanna did not institute a policy regarding the safe transfer

13

of equipment from the M/V TROOPER, River Ventures is not entitled to limitation of liability.

Damages

25. "[I]n actions brought under § 905(b), an injured LHWCA covered employee may recover those items of damages which are recoverable under the general maritime law, including monetary recovery for past and future loss of earning capacity and wages, past and future medical expenses, and pain and suffering resulting from an injury caused by the defendant's negligence. *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co.*, 324 F. Supp. 3d 808, 823 (E.D. La. 2018).

26. To determine lost future earnings, the Court must "estimat[e] the loss of work life resulting from the injury or death, calculat[e] the lost income stream, comput[e] the total damage, and discount[ ] that amount to its present value. [C]alculation of the lost income stream begins with the gross earnings of the injured party at the time of injury." *Mayne v. Omega Protein Inc.*, 370 F. App'x 510, 517 (5th Cir. 2010).

27. "The base figure used to calculate future wage loss is the difference between what a person could have earned 'but for' the accident and what he is able to earn upon returning to work in his partially disabled state." *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 899 (5th Cir. 1989) *mandate recalled & modified on other grounds*, 934 F.2d 67 (5th Cir. 1991).

28. "Evidence about the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other

individual and societal factors" is admissible to show lost future earnings. *Culver v. Slater Boat Co.*, 722 F.2d 114, 122 (5th Cir. 1983)

29. General damages are available "for pain and suffering and impact on one's normal life routines." *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 473 (5th Cir. 2015).

25. In calculating Plaintiff's general damages, this Court considered the similar injuries sustained by the plaintiff in *Terrebonne v. Goodman Mfg. Corp.*, 687 So. 2d 124 (La. App. 5 Cir. 1996), and took into account inflation since that award was given. The court in *Terrebonne* awarded the plaintiff $875,000 in general damages after he sustained a brain concussion and a concussive injury to his left inner ear after a fall from a truck. *Id.* The plaintiff suffered from constant headaches and dizzy spells, and his family reported that he was moody, irritable, and withdrawn. *Id.*

26. "If an LHWCA employee can properly assert a § 905(b) claim for vessel negligence, then his spouse can properly assert a loss-of-consortium claim." *White v. Cooper/T. Smith Corp.*, 690 F. Supp. 534, 540 (E.D. La. 1988).

27. Plaintiffs are entitled to prejudgment interest at a rate of 4% per annum from the date of judgment until paid on all past damages. *See Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 591 (5th Cir.), *opinion corrected on denial of reh'g on other grounds*, 848 F.2d 498 (5th Cir. 1988).

28. Plaintiffs are entitled to damages in the following amounts:

| | |
|---|---|
| Past medical expenses: | $289,301.68 |
| Future medical expenses: | $587,509.87 |

| | |
|---|---|
| Past lost wages: | $65,647.00. |
| Future lost earnings: | $1,140,636.00 |
| Past and future general damages: | $975,000 |
| Loss of consortium: | $250,000 |
| Total: | $3,308,094.55 |

## **CONCLUSION**

For the foregoing reasons, Plaintiffs are entitled to judgment against River Ventures, LLC on their 33 U.S.C. § 905(b) claim in the amount of $3,308,094.55. Defendant Centaur, LLC is entitled to judgment in its favor, dismissing with prejudice Plaintiff's claims against it.

New Orleans, Louisiana this 1st day of February, 2019.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**